IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

USA UP STAR, LLC,
     Plaintiff,

     v.

SANFORD FEDERAL, INC.,
*d/b/a* FAR GROUP,
     Defendant.

Civil No. 1:23cv1234 (DJN)

## MEMORANDUM OPINION

In March 2023, the United States contracted with Sanford Federal, Inc. to provide "sustainment support" for an Army training event in south-central Indiana. Unfortunately, Sanford won the contract less than two weeks before performance was to begin, and, scrambling to hold up its end of the deal, Sanford entered negotiations with a subcontractor to do the work instead. Over two brief weeks, Sanford and the subcontractor, USA Up Star, LLC, hashed out most of an agreement; running out of time, the two companies signed the instrument subject to the resolution of two remaining open terms. Negotiations continued, and eventually the parties reached a deal — or so they thought.

Mere days later, the Army threw a wrench in the works by "descoping" the most expensive (and most profitable) line item out of its contract with Sanford. This twist revealed, or perhaps motivated, the parties to form irreconcilable ideas about what price Sanford had contracted to pay for Up Star's services given the Army's partial termination. Sanford thought that it had agreed to pay Up Star $2.95 million. Up Star thought that it was owed $3.5 million. The parties could not bridge their six-figure disagreement, their relationship soured, and when Sanford ultimately refused to pay Up Star's final invoice, Up Star sued. This case was the result.

Up Star's lawsuit now comes before the Court on the parties' cross motions for summary judgment (ECF Nos. 35, 37), which the Court has converted to motions for judgment on the record. (ECF No. 46.)  This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law following a bench trial "on the papers."  After addressing each of Up Star's claims, the Court concludes that Sanford has the better view of the parties' negotiations, but that Sanford has no right to withhold the undisputed portion of the contract price.  The Court will accordingly GRANT IN PART and DENY IN PART both parties' motions.

## I.   FINDINGS OF HISTORICAL FACT[1]

On February 27, 2023, the United States requested quotes for a contract to house and support military personnel during a U.S. Army training event at Camp Atterbury, Indiana, in April and May of that year.  That contract (the "Army Contract") came with a Performance of Work Statement ("PWS") which included nine different Contract Line-Item Numbers ("CLINs") that the contractor was to perform.  Performance was to begin on April 1, 2023, and continue until May 16.  (ECF No. 36-1 ("Army PWS") at 3.)  The first CLIN, "Field Feeding," required the contractor to "provide all labor, supervision, quality control, preparation, cooking, serving, sanitation, and site clean-up" required to ensure that event participants received two meals a day, every day, for the duration of the training, beginning on April 13, 2023.  (*Id.* at 17.)

Defendant Sanford Federal, Inc. won the Army Contract on March 24, 2023, at a price of $4.82 million, and it opened the doors to subcontractors immediately.  On March 25, Plaintiff USA Up Star, LLC contacted Sanford and offered to perform the entire Army Contract for $4.36

---

[1]    In this section, facts recited without citation to the record have been assembled from those facts listed in the parties' statements of undisputed facts which the parties do not list as disputed in their counterstatements.  (ECF No. 36 ("Pl.'s Br.") at 2–21; ECF No. 38 ("Def.'s Br.") at 4–11; ECF No. 39 ("Pl.'s Opp.") at 2–11; ECF No. 40 ("Def.'s Opp.") at 2–12).  The Court treats these undisputed facts as stipulated and therefore judicially admitted. *Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 347 (4th Cir. 2014).

million.  The next day, March 26, Up Star followed up with a $100,000 discount, reducing its bid to $4.26 million, "based on the assumption" that Up Star would perform the entire Army Contract.  (ECF No. 36-2 at 1.)  Apparently, Sanford liked Up Star's discount, and Sanford e-mailed Up Star a Notice to Proceed ("NTP") on March 27.  The NTP required Up Star to begin performing on March 28 and committed the parties to "negotiate and execute a subcontract agreement within 48 hours."  (ECF No. 36-3.)  Up Star toured the site of performance on the day that Sanford issued the NTP.

On March 28, Up Star sent Sanford a report of its site visit, and Sanford relayed a list of questions contained in that report to the Army.  Up Star had questions about the Field Feeding CLIN.  Specifically, Up Star wanted to know whether the Army would provide Up Star with Unitized Group Rations ("UGR-As") that Up Star could then prepare.[2]  The Army responded on March 29 and informed both Sanford and Up Star that the Army would not provide any food. Sanford then e-mailed Up Star a proposed subcontract agreement based on Up Star's quote for $4.26 million.

On March 30, Up Star revised its price upward to $4.66 million to reflect the cost of providing its own food.  (ECF No. 36-7 (the "Revised Estimate E-mail") at 1–2.)  As Up Star explained, its March 26 quote incorrectly presumed that it would have access to UGR-As when performing the Field Feeding CLIN.  Without UGR-As, Up Star said, Field Feeding would cost

---

[2]      A UGR-A consists of three boxes that contain "[a]ll components for a complete 50-person meal," including "all food items and disposable items" together with "[c]ooking preparation sheets."  Def. Logistics Agency, *Operational Rations – Unitized Group Ration, A (UGR-A)*, https://www.dla.mil/Troop-Support/Subsistence/Operational-rations/UGR-A/ [https://perma.cc/C7YB-T7U3] (last visited May 22, 2024).  The Court finds it appropriate to take judicial notice of the Defense Logistics Agency's description of the UGR-A pursuant to Federal Rule of Evidence 201(b)(2).  *See United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites.").

3

at least an additional $800,000 to perform.  To sweeten the deal, Up Star offered to "split the cost with [Sanford] by taking additional margin from tents."  (*Id.* at 1.)  To summarize, Up Star's e-mail arrived at a total revised price of $4.66 million by adding $800,000 to the cost of Field Feeding and subtracting $400,000 from the cost of providing tents for Army personnel.  As before, Up Star premised this pricing "on the assumption" that Up Star would perform the entire subcontract, "as [its initial] discount was across the board, not based on any one item," and it explained that its quoted price reflected "the cost associated with [] Up Star doing the entire scope as estimated."  (*Id.* at 1–2.)

During the evening of March 30, Paul Switzer, Up Star's Senior Director of Purchasing and Subcontracts, e-mailed Sanford a signed copy of the subcontract agreement that Sanford provided the previous day.  Because Up Star disagreed with that Subcontract's price schedule, Up Star attached a separate document titled "Exceptions to the Agreement – PBS 3-30-23" (the "Exceptions Agreement") and a copy of the Revised Estimate E-mail, now titled "Attachment 1 – Revised Estimate – USA Up Star – PBS 3-30-23."  The Exceptions Agreement bears Up Star's logo and lists Switzer as the "[r]equestor."  (ECF No. 36-13 at 1.)  All of the circumstances therefore suggest that Up Star drafted the Exceptions Agreement.

When signing the Subcontract, Up Star's representative placed a footnote underneath his signature that read as follows:  "Contingent [on] amicable resolution of [the Exceptions Agreement]."  (ECF No. 36-9 at 1.)  Switzer's e-mail asked Sanford to "[p]lease review and execute upon approval," and told Sanford that Up Star would "commit . . . to work through the exceptions in good faith on or before the deadline set forth in the agreement and exceptions document."  (ECF No. 40-6.)  On Friday, March 31, Daniel Lynam, Sanford's Vice President, countersigned the Subcontract and the Exceptions Agreement; like Switzer, Lynam left a

4

footnote under his signature to the Subcontract reading "Contingent [on] amicable resolution of

[the Exceptions Agreement]."  (ECF No. 36-12 (Subcontract) at 1.)

The Subcontract states that Up Star would invoice Sanford "pursuant to the invoicing

schedule under Exhibit A."  (Subcontract § I.5, at 2.)  Exhibit A, reproduced below, set out prices

for each CLIN that Up Star would perform, adding up to a total of $4.26 million:

| Clin N° | SUPPLIES/ SERVICES | Quantity | Unit | Unit Price | Total |
|---|---|---|---|---|---|
| Clin 0001 | Field Feeding | 1 | Job | $ 1,307,334.10 | $ 1,307,334.10 |
| Clin 0002 | Temporary Tents Soldiers 60SQ FT | 1 | Job | $ 1,662,323.77 | $ 1,662,323.77 |
| Clin 0003 | Tent Structure Dining Facility | 1 | Job | $ 127,187.67 | $ 127,187.67 |
| Clin 0004 | Material Handling Equipment | 2 | Each | $ 20,123.18 | $ 40,246.35 |
| Clin 0005 | Shower Support | 9 | Each | $ 9,681.62 | $ 87,134.55 |
| Clin 0006 | Washer and Dryer Support | 3 | Each | $ 52,577.80 | $ 157,733.41 |
| Clin 0007 | Office Trailers | 3 | Each | $ 11,259.16 | $ 33,777.47 |
| Clin 0008 | Field Sanitation Support | 1 | Job | $ 43,713.94 | $ 43,713.94 |
| Clin 0009 | Bulk Potable Water Storage and Delivery | 1 | Job | $ 728,899.23 | $ 728,899.23 |
| Clin 0010 | Gray Water Storage and Removal | 1 | Job | $ 70,649.51 | $ 70,649.51 |
| | | | | Total | $ 4,259,000.00 |

(Subcontract Ex. A, at 9.)  The Subcontract also designated an invoicing procedure pursuant to

which Up Star would be paid:

> [Up Star] shall invoice [Sanford], pursuant to the invoicing schedule under
> Exhibit A, based on Services completed and accepted in accordance with the
> terms of the Subcontract.
>
> Invoices shall be separately numbered and sent to [Sanford] via email at .  [*sic*]  If
> [Up Star's] invoice does not comply with the requirements contained in this
> Subcontract, [Sanford] reserves the right to reject the invoice.  Payment of
> rejected invoices may be delayed pending correction of any errors or omissions.
>
> Unless otherwise specified in [an order issued by Sanford's procurement
> representatives], the terms of payment are Net 30 days from the date of
> [Sanford's] receipt of [Up Star's] complete and correct invoice containing all
> required information and supporting documentation requested by Sanford[.]

(Subcontract § I.5.)  Exhibit A itself provided a set of "invoicing instructions," specifying that

invoices should be sent to a particular e-mail address, "include all checklists for the period being

invoiced," and "clearly state[] Period of Performance, Invoice Date, Due Date, and include

banking/payment instructions."  (Subcontract Ex. A, at 9.)  In addition, those instructions

specified the amount of Up Star's invoices.  First, Sanford would pay Up Star's "[m]obilization

and demobilization" costs at a price of "$300,000 NET 15"; next, Sanford would make a

progress payment of "up to $1,500,000 upon government approval NET 20"; and finally, the

remainder of Up Star's invoice was required to be "billed upon completion and confirmation of

the services by the client NET 25."  (*Id.*)

The Exceptions Agreement, as relevant here, objected to the price of the Field Feeding

CLIN:

> The Field Feeding portion of [the Subcontract] shall be excluded from the
> responsibilities of [Up Star] and excluded from the [Subcontract] while under
> negotiation.  The [Field Feeding CLIN] value shall remain the same under the
> agreement while under negotiation.  Whereas the scope of work for this line item
> is not in question, both parties agree to work together towards a mutually
> acceptable cost for [the Field Feeding CLIN] pursuant to [the Revised Estimate
> E-mail], attached and labeled <u>Attachment 1</u>.  Furthermore, both parties agree that
> said negotiations shall be conducted in good faith to diligently and quickly work
> towards agreement on a final cost for this line item no later than 14:30 PM CST
> on Saturday April 1st 2023. Both parties are also in agreement that the additional
> cost related to this line item will not exceed $400,000.00.

(ECF No. 36-13.)  The parties agreed that "any language, terminology or clauses" in the

Subcontract would not "apply to or override the items under negotiation until mutually agreed

upon."  (*Id.*)

April 1 came and went without any agreement on the cost of Field Feeding.  In the

meantime, Sanford began negotiating with other subcontractors; between April 2 and 6, Sanford

contacted at least three subcontractors regarding performing various parts of the Army Contract.

6

On Monday, April 3, Sanford sent Switzer a proposed modification of the Subcontract. (ECF No. 1-7 at 2.)  The title of Sanford's e-mail was "MOD 0001."  Sanford's proposed modification (the "First Proposed Modification") increased the price of Field Feeding by $241,000 and left all other line items the same, resulting in a total contract price of $4.5 million. Up Star, acting through Switzer, rejected the First Proposed Modification.  As Switzer explained, Up Star's costs had unexpectedly and drastically increased.  One of its providers had gone on strike, and the kitchen facility at Camp Atterbury turned out to be "flooded and full of mold." Up Star thus had to source new staff, kitchen equipment, and kitchen trailers in addition to food. Now, he said, Up Star's price would be $4.26 million "minus Field Feeding," and the additional cost associated with Field Feeding itself would total $1.49 million, resulting in a total price of $5.75 million.  (ECF No. 1-7 at 1.)  Up Star had placed a reservation on two "mobile kitchens," but that reservation would be lost and the kitchens sent to Florida if the reservation were not confirmed by close of business.  Accordingly, Switzer stressed that Up Star needed "a decision and authorization to proceed" with Field Feeding by the end of that day.  (*Id.*)

Sometime between April 3 and 4, Sanford responded to Up Star's updated pricing by preparing a Second Proposed Modification.  That document removed Field Feeding from the Subcontract and revised all the other prices upward, resulting in a total contract price of $3.3 million:

| Clin N | Description | QNT | unit | Unit Price | Total |
|--------|-------------|-----|------|-----------|-------|
| Clin 0001 | Temporary Tents Soldiers 60SQ FT | 1 | job | $1,939,228.24 | $1,939,228.24 |
| Clin 0002 | Tent Structure Dining Facility | 1 | job | $148,374.18 | $148,374.18 |
| Clin 0003 | Material Handling Equipment | 2 | Each | $23,475.23 | $46,950.46 |
| Clin 0004 | Shower Support | 9 | Each | $11,294.35 | $101,649.14 |
| Clin 0005 | Washer and Dryer Support | 3 | Each | 13,554.46 | $40,663.39 |
| Clin 0006 | Office Trailers | 3 | Each | $13,134.67 | $39,404.01 |
| Clin 0007 | Field Sanitation Support | 1 | job | $50,995.67 | $50,995.67 |
| Clin 0008 | Bulk Potable Water Storage and Delivery | 1 | Job | $850,316.88 | $850,316.88 |
| Clin 0009 | Gray Water Storage and Removal | 1 | Job | $82,418.07 | $82,418.07 |
| | | | | Total Price | $   3,300,000.04 |

(ECF No. 36-14 at 1.)  Sanford prepared the Second Proposed Modification internally and never sent it to Up Star.

During the evening of April 3, Switzer texted Alae "Abby" Raihani, a Sanford employee. He noted once more that Up Star's discount from its original quote of $4.36 million was predicated on the assumption that Up Star would perform the entire Prime Contract; if that turned out not to be the case, Up Star's contract price would increase.  Up Star's original bid reflected a significant discount predicated on the assumption that Up Star would perform the entire Prime Contract.  On April 4, Switzer texted Raihani again and told her that if Sanford took over Field Feeding, Up Star would have to withhold its discount entirely and charge $4.26 million for the remaining eight CLINs, as the cost of tents would "go up as the food comes down."  (ECF No. 36-15 at 2.)

A series of phone calls followed.  Switzer first spoke with Lynam.  Then Switzer got a call from Sanford's General Counsel, who recommitted Sanford to continuing negotiations rather than abandoning the Subcontract.  Finally, Switzer spoke with David Finch, Sanford's Chief Global Growth Officer.  Finch agreed at his deposition that he spoke to Switzer to "see if there were options that [Up Star] would be willing to consider," such as "tak[ing] some tasks out of the

8

[Subcontract] to lower the price."  (ECF No. 36-17 ("Finch Dep.") at 52:20–53:1, 60:17–22.)

Sanford admits that this discussion was, at least, a continuation of the parties' negotiations.

On April 5, Switzer sent Finch an e-mail regarding their call the previous night.  In a

contemporaneous text message, Switzer noted that this e-mail (the "April 5 E-mail") "state[d]

verbatim what [Switzer and Finch had] discussed" (ECF No. 36-20 at 2), and in a preliminary

e-mail that Switzer sent the same morning, Switzer confirmed that the April 5 E-mail would

outline "the path forward as discussed for clarity in writing."  (ECF No. 36-21 at 1.)  Because the

April 5 E-mail has great importance to the parties' arguments, the Court reproduces that

communication verbatim below:

> David[,] my apologies on the delay, see below discussed verbiage for the drafted
> email for your review.  So I've copied and pasted it here.  Please review and
> advise if we need to revise before sending out.  Thank you again for your
> professionalism and your time.

> _____

> Gentlemen / [Sanford],

> Per my conversations with David Finch yesterday and today, please see below the
> discussed path forward for this project.

> As USA Up Star has informed [Sanford], per the site walk conditions, there is a
> 100% case for a change order, not only for the conditions of the site and facilities,
> but the additional items discussed on the site walk not included in the scope of
> work or amendments.  USA Up Star's original pricing was based on only the
> information per the PWS before this and, in turn, has prepared a long and detailed
> Change Order lining out the changes, add ons and deletions for [Sanford] or USA
> Up Star to give to COR and facilitate that change as soon as this morning.

> That being the case, please see the proposed scenarios for path forward:

> USA Up Star will speak directly to COR and Captain Green this morning and
> begin the process of securing the additional funds through change order as
> proposed prior.  [Sanford] shall also allow USA Up Star until End of Business
> Thursday April 6, 2023 to secure a commitment for COR on this change.

> 1. If USA Up Star is successful in securing the change, and [Sanford] opts to self
>    perform the field feeding portion of the scope, then [Sanford] agrees to pay
>    USA Up Star the originally agreed proposed price of $4,259,000.00 plus any

delta between the amount of the change order secured and the agreed upon price for the field feeding with their subcontractor.

2. If USA Up Star is successful in securing the change, and [Sanford] opts to have USA Up Star perform the field feeding portion of the scope, then [Sanford] agrees to pay USA Up Star the originally agreed proposed price of $4,259,000.00 plus the entire amount of the change order secured.

3. If USA Up Star fails in securing the change, then [Sanford] Group opts to self perform the field feeding portion of the scope, and FAR Group agrees to pay USA Up Star the revised price of $3,500,000.00 for the remaining scope with the following recognized exclusions:

   a. $3,500,000.00 covers the scope as presented in the PWS and is inclusive of a dining tent but is not inclusive of a kitchen tent, should that be required by FAR Group or their subcontractors, as noted in the site walk may be the case since the field kitchen on the Muscatatuck site is out of commission.

   b. This is also exclusive of any field kitchen, dining or cleaning equipment that may be required or additionally required per the site walk.

   c. This is exclusive of any walk-in coolers or freezers that may be required or additionally required per the site walk.

I hope this clearly defines the scope expected and the different scenario[s] in which USA Up Star and [Sanford] and proceed forward in an amicable manner on this job and potentially have common ground to work together in the future, should the opportunity arise.

USA Up Star has great respect and admiration for our member of the service and it['s] recognized that members of both our groups have served this country respectfully and with honor and that is how we conduct ourselves in business. Thank you for you[r] time and the opportunity to lay this out.

I would suggest we have a call later today to confirm and clarify the entirety of what is laid out above which is what was discussed between David and myself. Should any part be miscommunicated, we can clarify then.

PS – We can set up a second call, after a path forward, to share the issues field feeding has presented if not shared with you by your project manager as of yet. These will be crucial to share with whoever performs the field feeding and may better explain the price fluctuations in that area[.]

(ECF No. 36-23 at 1–2.)

10

Finch replied to the April 5 E-mail and told Switzer that "[the e-mail] reflects what we said." (*Id.* at 1.) The April 5 E-mail refers to itself as a draft submitted for Finch's review. However, it appears that the version reproduced by the Court was the final one, and the April 5 E-mail was forwarded among and saved by Sanford staff without alteration. Sanford never informed Up Star that it rejected or disagreed with the proposition embodied by the April 5 E-mail.[3] On April 6, Sanford subcontracted with a firm called First Class Catering to perform the Field Feeding portion of the Army Contract.

Meanwhile, on or after April 5, Lynam traveled to Indiana and met with Up Star representatives for lunch. By the time of that lunch meeting, Up Star had already begun performing the Subcontract. There, Up Star's owner, Klayton South, told Lynam that "the price for service was 3.5 million." (ECF No. 40-5 ("South Dep.") at 99:22–100:1.) Lynam asked Up Star to "shave off a couple hundred thousand dollars [from] the 3.5 million" in exchange for cooperation on future government contracts. (*Id.* at 69:20–70:4.)[4] South did not testify that any agreement was made at the lunch meeting, and Up Star contends only that this meeting "confirmed" the $3.5 million price. (Pl.'s Br. ¶ 74.) Sanford passed no opportunities along to Up Star, and no further negotiations on the Subcontract's price appear to have taken place.

---

[3]    The parties dispute whether Up Star knew that Finch lacked authority to negotiate or contract on Sanford's behalf. However, for reasons that the analysis below will clarify, Finch's apparent authority proves irrelevant to the disposition of this case.

[4]    Lynam, at his deposition, could remember no confirmation of price. In an affidavit submitted as Exhibit G to Sanford's opposition to Up Star's motion for summary judgment, Lynam confirms that he cannot "recall the details of [his] conversation [with Up Star] that day," but "affirmatively state[s]" that Sanford never "confirmed or agreed to a price of $3,500,000." (ECF No. 40-7 ¶ 5.) Up Star asks the Court to strike Lynam's declaration as a "sham affidavit" (ECF No. 42 at 4–7), but the Court finds that unnecessary. South can remember the conversation at the lunch meeting; Lynam cannot. The Court finds that no genuine dispute exists regarding South's recollection of the historical facts.

On Friday, April 7, the United States terminated Field Feeding from the Army Contract "for convenience of the Government," citing the parties' inability to confirm that food would be provided to the soldiers. (ECF No. 36-28 (Ltr. from Megan M. Abbott to Daniel Lynam) at 3 (citing 48 C.F.R. § 12.403(d)).) That Sunday, April 9, Sanford discussed the Government's termination internally. As one e-mail recounted, the Government's termination reduced the value of the Army Contract from $4,817,857.89 to $3,338,977.89. (ECF No. 36-29 at 1.) The Sanford official writing that e-mail went on to say that "our subcontractor [Up Star] has proposed in writing to perform all services except for the catering for $3,500,000.00, which potentially might leave us with $161,022.11 loss." (ECF No. 36-29 at 1.) "However," that e-mail continued, "by descoping [Field Feeding] from our contract with [Up Star], we need to remove $1,548,334.10 from a total of $4,500,000.00. Our direct cost should [then be] $2,951,665.90, which will leave us with $387,311.99 profit. In case of a legal dispute, our general counsel Mr. Dror has agreed and confirmed that we have a strong case to fight it." (*Id.* at 2.)

Ultimately, Up Star performed the entire Prime Contract except for Field Feeding. But when the time came for payment, the parties discovered that they were at loggerheads on price. Since June 2, 2023, Sanford has contended that the parties are bound by the price terms listed in Exhibit A to the Subcontract. In its view, although the parties agreed to negotiate the price of Field Feeding, there was no need to continue negotiations after the Army terminated that portion of the Army Contract. Thus, Sanford says, it owes Up Star the sum of the prices that Exhibit A listed for CLINs 0002 to 0010: $2,951,665.90. Up Star disagrees. It argued in June 2023, as it does now, that the parties are bound by the terms of the April 5 E-mail. In its view, because Up Star never obtained additional funding from the Army, and because Sanford purportedly opted to self-perform Field Feeding by contracting with First Class Catering, Sanford selected the April 5

E-mail's third option, thus committing Sanford to a contract price of $3.5 million. (Pl.'s Br. at 20, 24.)

The parties encountered a dispute over invoicing due to their underlying price dispute. Sanford happily paid Up Star $300,000 for mobilization costs and a progress payment of $1.5 million, as Exhibit A to the Subcontract contemplated. But Up Star's final invoice was for an amount far exceeding the $1.15 million that Sanford believed was left for it to pay. For this reason, Sanford rejected Up Star's final invoice as noncompliant. As things stand now, Sanford has paid Up Star $1.8 million. Up Star believes that it stands entitled to $1.7 million more. Sanford believes that it has a contract to pay Up Star $1.15 million if and when Up Star submits an invoice for that amount.[5]

## II.        PROCEDURAL HISTORY

On September 12, 2023, Up Star filed this civil action. Its complaint pleads four claims: breach of contract ("Count 1"), breach of implied-in-fact contract ("Count 2"), breach of implied-in-law contract ("Count 3") and breach of bailment ("Count 4"). (ECF No. 1 ("Compl.") at 26–34.) Up Star pleaded Counts 2 and 3 in the alternative to Count 1. In the course of discovery, the parties settled Count 4 out of court, and the undersigned dismissed that Count with prejudice. (ECF No. 29.) Discovery closed on April 15, and the parties timely filed cross motions for summary judgment on all of Up Star's claims on April 26. (ECF Nos. 35, 37.)

Neither party demanded a jury trial, and the record presented on summary judgment was complete and undisputed. Thus, seeking to conserve resources, the Court solicited the parties' consent to final decision of this case on the summary judgment record. (ECF No. 43.) The

---

[5]      Sanford arrives at this amount by subtracting the $1.8 million that it already paid Up Star from Sanford's asserted total contract price.

parties agreed.[6]  (ECF No. 44, 45.)  Accordingly, on June 3, the Court converted the parties' motions for summary judgment to cross motions for judgment on the record.  (ECF No. 46.)  The Court now renders its findings and conclusions following a bench trial "on the papers."

## III.      PROCEDURAL POSTURE

This dispute comes before the Court on cross motions for summary judgment.  Federal Rule of Civil Procedure 56 requires the Court to grant a movant summary judgment "if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law."  All "justifiable inferences are to be drawn in the [nonmovant's] favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  When parties file cross motions for summary judgment, the court must consider each motion separately, "resolv[ing] all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion."  *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Four-C-Aire, Inc.*, 42 F.4th 300, 308 (4th Cir. 2022) (internal quotation omitted).

An uncommon set of circumstances make a simpler procedure possible here.  When the Court itself will be the finder of fact and "the parties [do] not contradict one another's proffered facts, but only dispute[] the inferences that a fact finder would draw from those underlying facts," it would be wasteful for the Court to consider two sets of factual inferences instead of proceeding to the actual question:  Who wins?  *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003).  If the parties consent, a court may address that question directly by conducting "a Rule 52 bench trial" in which it stands free to "resolve disputed facts and render a judgment" on a paper record.  *Tekmen v. Reliance*

---

[6]      Up Star consented to a final decision on the merits but requested an opportunity to submit additional evidence regarding the measure of its *quantum meruit* recovery if necessary.  (ECF No. 45 at 2.)

14

*Standard Life Ins.*, 55 F.4th 951, 961 (4th Cir. 2022).  Thus, when the parties consented to final

decision of this case on the summary judgment record, they "effectively ask[ed] the district court

to conduct a bench trial." *TBL Licensing, LLC v. Vidal*, 98 F.4th 500, 510 (4th Cir. 2024).  The

Court therefore proceeds to try this case "on the papers," looking to a summary judgment record

composed of undisputed facts, exhibits, affidavits and deposition transcripts. *Satellite Television*

*& Assoc'd Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 354 (4th Cir. 1983).

## IV.       ANALYSIS

### A. Breach of Contract (Count 1)

#### 1.       Virginia's Law of Contracts

To recover for breach of contract, a plaintiff must prove "(1) a legally enforceable

obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation;

and (3) injury or damage to the plaintiff caused by the breach of obligation." *Young-Allen v.*

*Bank of Am.*, 839 S.E.2d 897, 901 (Va. 2020) (quotation omitted).[7]  To satisfy the first

element — the existence of a legally enforceable obligation — the Court must find, as relevant

here, the parties to the purported contract manifested "mutuality of assent," also known as a

"meeting of the minds." *Phillips v. Mazyck*, 643 S.E.2d 172, 175 (Va. 2007).

Mutuality requires that "the parties have a distinct intention common to both and without

doubt or difference," and their minds must meet "on every material phase of the alleged

agreement." *Id.* (quotations and citations omitted).  Thus, no contract can exist if the parties

"never mutually assented to terms proposed by either as essential to an accord." *Valjar, Inc. v.*

---

[7]       The parties' briefing assumes that Virginia's substantive law governs all issues in this
proceeding.  The parties' "failure to object" to their counterparties' citations to Virginia law and
their "affirmative invocations of that law" together constitute "a waiver of any argument that
another state's law should be applied." *Wiener v. AXA Equitable Life Ins.*, 58 F.4th 774, 781 (4th
Cir. 2023).  Thus, the Court does not address choice of law.

*Mar. Terminals, Inc.*, 265 S.E.2d 734, 737 (Va. 1980). The inquiry is objective: courts must "ascertain whether a party assented to the terms of a contract from that party's words or acts, not from his or her unexpressed state of mind." *Phillips*, 643 S.E.2d at 175.

Mutual assent does not require agreement on the precise meaning of every term, but an agreement must be found void if it cannot be construed to be "certain and definite as to the nature and extent of service to be performed, the place where and the person to whom it is to be rendered, and the compensation to be paid." *Reid v. Boyle*, 527 S.E.2d 137, 145 (Va. 2000) (quoting *Mullins v. Mingo Lime & Lumber Co.*, 10 S.E.2d 492, 494 (Va. 1940)). Virginia "does not favor" such a drastic step, and indefiniteness cannot be declared if the parties' obligations "can be ascertained with reasonable certainty from language used," "especially [] where there has been partial performance." *Id.* at 143 (quoting *High Knob, Inc. v. Allen*, 138 S.E.2d 49, 53 (Va. 1964)).

Contract formation stands distinct from contract interpretation. When interpreting a written contract, "extrinsic evidence will be excluded when offered to add to, subtract from, vary or contradict" the written terms. *High Knob*, 138 S.E.2d at 52. Thus, "where parties have reduced their contract to a writing which imposes a legal obligation in clear and explicit terms the writing shall be the sole memorial of that contract, and it is conclusively concluded that the writing contains the whole contract, and is the sole evidence of the agreement." *Jim Carpenter Co. v. Potts*, 495 S.E.2d 828, 832–33 (Va. 1998) (quoting *Pulaski Nat'l Bank v. Harrell*, 123 S.E.3d 382, 387 (Va. 1962)).

Finally, a contract in writing can be modified by a subsequent agreement, even if the contract has an anti-amendment provision, since "any oral variation of the writing which may be agreed upon and which is supported by a sufficient consideration is by necessary implication a

16

rescission to that extent." *Reid*, 527 S.E.2d at 145 (quoting *Zurich Gen. Accident & Liab. Ins. v. Baum*, 165 S.E. 518, 519 (Va. 1932)).  However, such a modification must be shown by "clear, unequivocal and convincing evidence, direct or implied." *Id.* (quoting *Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983)).

### 2. Existence and Nature of an Obligation

#### a. The Parties Have a Contract.

The Court now proceeds to the merits and considers the combination of the Subcontract and the Exceptions Agreement, as well as the Revised Estimate E-mail to the extent that document stands incorporated into the former two.  At the outset, Up Star appears to concede that these documents bind the parties (ECF No. 36 ("Pl.'s Br.") at 22), but later, Up Star contends instead that the parties had no contract at all "until the issues set forth in the Exceptions Agreement were amicably resolved."  (ECF No. 42 ("Pl.'s Reply") at 8.)  If Up Star contends that it was not bound after the parties signed the Subcontract and Exceptions Agreement, the Court disagrees.  The signed and countersigned documents indicate that the parties agreed to *something*; the Court cannot interpret those signatures — not to mention the Exceptions Agreement's declaration that "[b]oth parties agree to continue to perform the functions and duties, other than mentioned below, required by the [Subcontract]" — as anything other than an objective manifestation of an intent to be bound.  (ECF No. 36-13 at 1.)

Up Star also argues that the Subcontract expired when the parties failed to agree on a contract price by April 1.  That contention turns on language in the Exceptions Agreement stating that the parties agreed to negotiate "in good faith to diligently and quickly work towards agreement on a final cost for [Field Feeding] no later than 14:30 PM CST on Saturday April 1[st,] 2023."  (ECF No. 36-13 at 1.)  But that language does not indicate or imply that the entire Subcontract would evaporate if no deal was reached by the critical date and time.  Rather, "'well-

settled'" Virginia law holds that such an "agreement[] to negotiate" a future deal "in good faith"

cannot be enforced. *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 300 (Va. 2016). Any

agreement to "negotiate open issues in good faith to reach a contractual objective within an

agreed framework will be construed as an agreement to agree rather than a valid contract." *Id.*

(quoting *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F. Supp. 2d 572, 578 (E.D. Va.

2013)) (cleaned up). The April 1 deadline thus did not constitute a binding obligation at all, let

alone an obligation so categorical that it could invalidate the entire Subcontract.

### b.    *The Contract Sets a Price.*

Because the parties formed a binding contract, the Court turns to the interpretation of

their deal. The question here becomes whether the parties, by executing the Subcontract and

Exceptions Agreement as written, agreed to be governed by the price schedule in Exhibit A for

every CLIN except Field Feeding. The Court finds that they did.

The text of the documents begins and ends the inquiry. The Exceptions Agreement

indicates limited disagreement between the parties as of March 31. As relevant here, it provides

that "[b]oth parties agree[d] to continue to perform the functions and duties, other than

mentioned below, required by the [Subcontract]." (ECF No. 36-13 at 1.) It also states that "both

parties agree[d] to work together towards a mutually acceptable cost for Clin 0001," i.e., for

Field Feeding. (*Id.*) Finally, the Exceptions Agreement commits the parties to work together

"pursuant to the [Revised Estimate E-mail], attached and labeled Attachment 1." (*Id.*) These

three documents all embody the parties' agreement and must be considered together.

In the Revised Estimate E-mail, Paul Switzer offered to "tak[e] additional margin from

tents" to soothe the sting of Up Star's increased price for Field Feeding and stated that his new

estimate of $4.66 million was "based on the assumption that USA Up Star does the entire scope

18

of work." (ECF No. 36-7 at 2.)  Switzer did not offer a new price for Field Feeding alone.  He offered a bottom-line price for the entire project, and he shuffled other line items around to get there.  The Revised Estimate E-mail, taken on its own, thus suggests that other line items remained open for negotiations.

However, the text of the Revised Estimate E-mail constitutes only a part of the parties' agreement.  The Court must construe that agreement "as a whole," harmonizing all provisions and "giving effect to each when reasonably possible." *Schuiling v. Harris*, 747 S.E.2d 833, 836 (Va. 2013).  Parties rarely use words needlessly, and not a single word should be "treated as meaningless if a reasonable meaning can be given to it." *PMA Cap. Ins. v. U.S. Airways, Inc.*, 626 S.E.2d 369, 372–73 (Va. 2006).  And the Exceptions Agreement clearly states that the parties disputed the price of Field Feeding and excluded only that CLIN from the Subcontract pending further negotiation.[8]  That language, not to mention the parties' commitment to performing all their "functions and duties" except those objected to, would be rendered meaningless were the Court to accept Up Star's assertion that no agreement on price was reached on March 31.

The Court does not struggle to harmonize the parties' apparent commitment to a price on CLINs 0002 to 0010, on the one hand, with the parties' agreement to negotiate "pursuant to" the Revised Estimate E-mail, on the other.  The Exceptions Agreement postdates Switzer's offer in that e-mail.  At the time that the Revised Estimate E-mail was written, all price terms remained open.  But after signing the Subcontract and Exceptions Agreement, the only open term was Field Feeding.  The parties could easily honor their commitment to negotiate "pursuant to" the Revised Estimate E-mail by negotiating for a *modification* of the Subcontract with respect to

---

[8]     Indeed, were there any ambiguity in the language of the Exceptions Agreement, the Court would be bound to construe it against the drafter of that instrument — Up Star.  *Drs. Co. v. Women's Healthcare Assocs.*, 740 S.E.2d 523, 536 (Va. 2013).

CLINs 0002 to 0010 at the same time that they negotiated for *formation* of a price term for Field Feeding.

Up Star contends that it did not assent to this deal, because its offers were always contingent on Up Star performing the entire Army Contract. The Court does not doubt, and Sanford does not dispute, that Up Star offered the price that it did because it assumed that it would perform every CLIN. But that assumption remains exactly that.[9] No term of the Subcontract contemplates that the CLINs were inseverable from one another. Indeed, the Exceptions Agreement that Up Star drafted requires exactly the result that Up Star now disclaims. That document specified that Field Feeding would "be excluded from the responsibilities of [Up Star] and excluded from the [Subcontract] while under negotiation." (ECF No. 36-13.) If only Field Feeding was excluded pending an agreement on price, it necessarily follows that the other CLINs remained in effect. Up Star's disappointed expectations provide no reason to disregard the plain terms of its deal.

### c. *Up Star Has Not Carried its Burden to Prove That the April 5 E-mail Modified the Parties' Deal.*

Because the parties contracted to a price for CLINs 0002 to 0010, the Court must next consider whether Up Star has carried its burden to prove that the document that Up Star asserts controls this dispute — the April 5 E-mail — modifies that deal. The Court concludes that Up Star has not carried this burden. The April 5 E-mail certainly reflected the parties' negotiations as they stood on that morning. But the Court cannot find sufficient indicia of finality that would

---

[9]     To be true, the Revised Estimate E-mail states that its price quote "is the cost associated with USA Up Star doing the entire scope," but that language could not be fairly read to create a condition even if the parties had not rendered that language irrelevant by agreeing to a different bargain.

allow it to conclude even by a preponderance that, on that date, the parties consummated their deal. Up Star fails to provide clear and convincing evidence of its desired deal.

To begin with, the text of the April 5 E-mail does not clearly reflect a finalized agreement. The E-mail embodies a "discussed path forward" and lists three "proposed scenarios." (ECF No. 38-5 at 1.) Although each of the "proposed scenarios" listed is written in the indicative rather than the subjunctive mood (i.e., it states that Sanford in fact "agrees" to pay Up Star, rather than stating "We propose that Sanford agree to pay Up Star"), that comes as no surprise. Businessmen are not grammarians. The proposal outlined in the April 5 E-mail is complex. It was drafted the morning after hours of meetings and phone calls during the previous night, in a business deal where a quick turnaround was imperative for both Sanford and Up Star. It would have been awkward and pedantic for Switzer, the E-mail's drafter, to clarify at every turn that the proposals did not constitute a consummated deal.

The context of the April 5 E-mail's drafting also does not confirm that the E-mail embodied the parties' final agreement. Switzer and Finch, in various communications, confirmed that the April 5 E-mail reflected their discussion of the previous night. All the parties ever said about this E-mail was that it laid out "the path forward" as Switzer and Finch had discussed, and that the E-mail "reflects what [Switzer and Finch] said." Neither statement indicates finality.

No evidence suggests that the April 5 E-mail was anything other than the next stage of negotiations. Indeed, Sanford's conduct preceding and following the sending of the E-mail suggests that Sanford did not think the parties had reached a deal. When Sanford made final offers to Up Star throughout negotiations, Sanford prepared formal modification agreements. Indeed, Sanford did this twice during the very same week that the E-mail was sent, though only

one of those agreements was ever communicated to Up Star. Sanford prepared these modifications quickly. There was no reason that Sanford could not have formally memorialized the April 5 E-mail in such an agreement in the two days that Sanford had before the Government threw a wrench in the works on April 7. But no evidence has been offered that Sanford prepared such a modification, thought about preparing it, or at any point believed that one was necessary. That weighs against a finding of finality. Likewise, Lynam's and South's lunch meeting on (or after) April 5 confirms that the April 5 E-mail did not embody a final deal. Up Star does not dispute that Lynam attempted to bargain Up Star down from its $3.5 million figure at that lunch. In other words, shortly after the parties reached an allegedly final agreement, negotiations continued as though no agreement had been made.[10] This, too, indicates that the April 5 E-mail did not form a contract.

The April 5 E-mail did not bring an end to the parties' negotiations. The Court thus concludes that Up Star has not carried its burden to prove, as a matter of fact and by clear and convincing evidence, that the April 5 E-mail conclusively modified the parties' deal instead of merely memorializing the state of play as of that morning. Up Star "cannot alchemize [Sanford's] exploration of an offer into acceptance of its terms." *Multiscaff Ltd. v. APTIM Fed. Servs., LLC*, No. 1:23cv1369, 2024 WL 234736, at *10 (E.D. Va. Jan. 22, 2024) (applying Virginia's law of contract formation).

⁎⁎⁎

On the morning of April 1, 2023, the parties had a contract for Up Star to perform CLINs 0002 to 0010 for $2,951,665.90. The parties intended to agree on a price for Field Feeding, and

---

[10]     If a modification had been executed, the Court could perhaps interpret the Lynam-South lunch meeting as a negotiation to modify the modification. However, the Court does find such an inference probable.

they negotiated for changes to their deal that, if memorialized and accepted, would have constituted a modification. But they never did so. Sanford already paid Up Star $1.8 million dollars, so it owes Up Star only $1,151,665.90 more.

### 3.     Breach

Having determined the terms of the promise that Sanford made to Up Star, the Court next addresses whether Sanford broke it. *Young-Allen*, 839 S.E.2d at 901. Sanford does not dispute that it has underpaid Up Star by more than a million dollars. Instead, Sanford contends that the Subcontract's invoicing requirement constitutes a condition precedent to Sanford's payment, and that, because Up Star never submitted an invoice for the correct dollar amount, Sanford's performance must be excused.

If a contractual duty stands subject to a condition, then performance of that duty "cannot become due unless the condition occurs." *Rastek Constr. & Dev. Corp. v. Gen. Land Commercial Real Estate Co.*, 806 S.E.2d 740, 745 (Va. 2017) (quoting *Restatement (Second) of Contracts* § 225(1) (Am. L. Inst. 1981)). Although the Subcontract does not say so in as many words, the Subcontract's specification that "the terms of payment are Net 30" from the date that Sanford receives a "complete and correct invoice" betrays an intent that Sanford have no obligation to pay absent the receipt of a compliant invoice from Up Star. (Subcontract § I.5.) The existence of a breach therefore turns on whether Up Star's invoice was "complete and correct."

The Subcontract does not clearly define what makes an invoice "complete and correct," and the parties do not address the question in any depth. Exhibit A's "invoicing instructions" require that invoices should clearly state the period of performance, the invoice date and the due date. (Subcontract Ex. A, at 9.) Sanford does not contend that Up Star's invoice failed to

23

include any of this information.  It seems that Sanford's only complaint is that Up Star wrote the wrong figure in the "amount due" column.  The Court need not inquire whether that error constituted a technical failure of the condition.  Even if did, the Court would find that Up Star's invoice was substantially complete.  The failure of an insubstantial requirement does not excuse performance.  *Neely v. White*, 14 S.E.2d 337, 341 (Va. 1941); *Horton v. Horton*, 487 S.E.2d 200, 203–04 (Va. 1997).

Assuming without deciding that Up Star's mispriced invoice fell out of literal compliance with the Subcontract, the Court finds that error immaterial and Sanford's performance unexcused.  Sanford breached the Subcontract by refusing to pay Up Star the $1.15 million it was owed.  Judgment will be entered for Up Star on Count 1.

### B.      Breach of Implied-in-fact Contract (Count 2)

Up Star next contends that, even if it had no written contract with Sanford, the parties formed a binding implied-in-fact contract.  An implied-in-fact contract "is one in which behavior takes the place of articulate acceptance," *Brines v. XTRA Corp.*, 304 F.3d 699, 703 (7th Cir. 2002) (Posner, J.), such that the terms of the parties' agreement can be inferred from "a consideration of the parties' acts and conduct" instead of from their writings.  *Spectra-4, LLP v. Uniwest Commercial Realty, Inc.*, 772 S.E.2d 290, 295 (Va. 2015) (cleaned up).

Consider a simple example of a contract implied in fact.  Bob walks into his neighborhood barber shop, looking for a shave and a haircut.  He sits down in the barber's chair, shows the barber a picture of the style that he wants, and receives a service.  After the shave and haircut, Bob walks out of the shop and goes along his day.  If the barber sues Bob for breach of contract, Bob cannot defend on the ground that he never agreed to a deal.  Social norms make it clear beyond doubt that Bob's actions indicate an offer to pay money for services, and the barber

24

accepted that offer by performance. The two of them had a deal, and that deal has no less legal effect due to its unwritten nature. The facts imply a contract.

Nothing like that set of circumstances happened here. Up Star argues that "[t]he parties' acts and conduct following the [April 5 E-mail] demonstrate mutual agreement and a meeting of the minds, establishing an implied-in-fact contract . . . for [Up Star] to perform the entire [Army Contract], excluding Field Feeding, for $3,500,000.00." (Pl.'s Br. at 28.) That argument does not show that the parties manifested assent at some date other than April 5. Instead, what Up Star labels assent to a contract implied in fact instead constitutes evidence that the parties assented to the April 5 E-mail itself. For that reason, Up Star's arguments that Sanford assented to the April 5 E-mail's deal by failing to disavow it miss the mark.

Further, one of Up Star's key premises fails. Up Star's argument presumes that the Subcontract never became effective. (Pl.'s Br. at 28.) But, as the Court explained above, *see* Part IV.A.3.a., *supra*, the parties executed a valid, written, definite contract by signing the Subcontract and Exceptions Agreement. "It has been well settled" for decades that "the law will not imply an agreement in contravention" of an express, written contract. *S. Biscuit Co. v. Lloyd*, 6 S.E.2d 601, 606 (Va. 1940). If anything, the conduct that Up Star points to indicates a modification, but as already explained, no modification transpired. In short, the parties made no implied-in-fact contract, and Up Star points to no evidence showing that the parties agreed implicitly on an issue they tried and failed to resolve explicitly. Up Star has not demonstrated an entitlement to recovery on an implied-in-fact theory, and judgment will be entered against it on Count 2.

### C.   Breach of Implied-in-law Contract (Count 3)

Up Star's *quantum meruit* claims fails too, and quickly. In Virginia, settled doctrine holds that courts must imply a contract where one person confers a benefit to another without

making an agreement as to compensation. *T. Musgrove Constr. Co. v. Young*, 840 S.E.2d 337,

341 (Va. 2020). But *quantum meruit* recovery cannot be awarded "when there is an express,

enforceable contract between the parties covering the services for which *quantum meruit*

recovery is claimed." *Mongold v. Woods*, 677 S.E.2d 288, 292 (Va. 2009). Here, the parties had

such an express contract, so Up Star can find no relief in restitution. Judgment will be entered

against it on Count 3.

### D.   Prejudgment Interest

The Court has determined that Sanford owes Up Star $1.15 million dollars in contract

damages. One issue remains: Up Star's entitlement to prejudgment interest. (*See* Compl. at 34

(requesting that relief on Count 1).) In a diversity case such as this one, state law governs the

award of prejudgment interest. *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 311 (4th

Cir. 2020). Here, Virginia law provides that a trial court "may provide for interest on any

principal sum awarded, or any part thereof, and fix the period at which the interest shall

commence." Va. Code § 8.01-382. This provision "authorizes a trial court to award prejudgment

interest" on a "discretionary" basis. *Devine v. Buki*, 767 S.E.2d 459, 468 (Va. 2015).

Virginia caselaw establishes two principles that guide the Court's discretion. First,

prejudgment interest aims to "make the plaintiff whole" and constitutes "part of the actual

damages sought to be recovered." *Dairyland Ins. v. Douthat*, 449 S.E.2d 799, 801 (Va. 1994).

Second, and equally, Virginia disfavors prejudgment interest "on unliquidated damages in

dispute between the parties." *Advanced Mar. Enters. v. PRC Inc.*, 501 S.E.2d 148, 160 (Va.

1998). Thus, the Fourth Circuit has read Virginia law to require lower courts to "weigh the

equities in a particular case to determine whether an award of prejudgment interest is

appropriate." *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 727 (4th Cir. 2000). In this

District, courts typically weigh the equities by balancing the two competing policies articulated

by the Supreme Court of Virginia:  the policy in favor of compensating plaintiffs for the loss of use of their money and the policy against punishing defendants who exercise their right to litigate a bona fide and unliquidated legal dispute.  *United States ex rel. McKenney's, Inc. v. Leebcor Servs., LLC*, 622 F. Supp. 3d 165, 176 (E.D. Va. 2022); *Wells Fargo Equip. Fin., Inc. v. State Farm Fire & Cas. Co.*, 823 F. Supp. 2d 364, 366–67 (E.D. Va. 2011).

The Court will award prejudgment interest.  For the last year, the parties have butted heads over contract price, but they have never disputed Up Star's entitlement to the sum that the Court awards today.  Up Star manifestly had a right to that amount.  The only reason that Sanford refused to pay that money over to Up Star was Sanford's insistence on an immaterial invoicing technicality.  As stated before, the Court takes no view on whether Up Star's mis-priced invoice failed to comply with a condition precedent to payment, but the Court finds Sanford's refusal to pay over this undisputed amount to be unreasonable.  Virginia's policy of protecting defendants' rights to litigate a bona fide dispute does not justify refusing prejudgment interest on this sum, especially not where Sanford has otherwise prevailed.

Prejudgment interest on Up Star's judgment shall accrue at a rate of six percent per year.  Va. Code § 6.2-302(A).  In its discretion, the Court determines that prejudgment interest shall run from July 20, 2023, "[n]et 30 days" from June 20, 2023, the date on which Up Star submitted its final invoice to Sanford — and thus the date on which Up Star should have been paid.  (Subcontract § I.5.)

## V.    FINDINGS AND CONCLUSIONS

After a bench trial, the Court "must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  Accordingly, the Court now summarizes and restates its findings of fact and conclusions of law.

A.    **Findings of Fact**[11]

1. The parties assented to a binding contract when they signed the Subcontract and the Exceptions Agreement.

2. The parties did not assent to be bound by the April 5 E-mail.

3. Up Star has not shown by clear and convincing evidence that the parties modified their agreement at any point.

4. The parties never assented to an implied-in-fact contract.

B.    **Conclusions of Law**

1. Sanford is liable on Count 1 of Up Star's complaint.

2. Sanford is not liable on Counts 2 and 3 of Up Star's complaint.

3. The contract price for the services Up Star performed is $2,951,665.90.

4. Up Star's invoice to Sanford substantially complied with the Subcontract's terms, and thus Sanford was not excused from paying Up Star.

5. Accordingly, Sanford's liability on Count 1 equals $1,151,665.90.

6. Up Star's judgment shall be subject to prejudgment interest at a rate of six percent per year, running from July 20, 2023, to the date of the judgment in this case. Post-judgment interest shall accrue pursuant to 28 U.S.C. § 1961.

---

[11]    Although Virginia precedent holds that "[t]he question of whether a valid contract exists is a pure question of law," *Spectra-4*, 772 S.E.2d at 293, Virginia's view on the "allocation of function between judge and jury" has no relevance in diversity cases. *Justice v. Pennzoil Co.*, 598 F.2d 1339, 1342 (4th Cir. 1979). Instead, the *Erie* doctrine, as interpreted by the Fourth Circuit, states that "federal law must govern whether a question is one of law or fact." *Archer Daniels Midland Co. v. Brunswick Cty.*, 129 F. App'x 16, 23 (4th Cir. 2005). As a matter of federal law, "the issue whether there has at any time been the requisite manifestation of mutual assent to a bargained exchange" must generally be classified as a factual question. *Charbonnages de France v. Smith*, 597 F.2d 406, 415 (4th Cir. 1979). Accordingly, the Court treats its conclusions regarding assent as findings of fact.

*     *     *

Judgment will be entered for Up Star and against Sanford on Count 1 of Up Star's complaint in the amount of $1,151,665.90, subject to pre- and post-judgment interest. Judgment will be entered against Up Star and for Sanford on Counts 2 and 3 of Up Star's complaint. The parties' cross motions for summary judgment will be GRANTED IN PART and DENIED IN PART.

An appropriate order shall issue.

Let the Clerk file a copy of this Memorandum Opinion and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Alexandria, Virginia
Date:  June 13, 2024